# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 38

*April Term, A.D. 2026*

April 8, 2026

BOARD OF PROFESSIONAL
RESPONSIBILITY, WYOMING
STATE BAR,

Petitioner,

v.

D-26-0001

KENT C. COBB, WSB #8-6998,

Respondent.

## ORDER OF THREE-MONTH SUSPENSION

[¶1]    **This matter** came before the Court upon a Report and Recommendation for Three-Month Suspension, filed herein March 5, 2026, by the Board of Professional Responsibility for the Wyoming State Bar.  The Report and Recommendation was filed pursuant to Rule 12 of the Wyoming Rules of Disciplinary Procedure, which governs stipulated discipline. The Court, after a careful review of the Board of Professional Responsibility's Report and Recommendation and the file, finds that the Report and Recommendation should be approved, confirmed and adopted by the Court, and that Respondent Kent C. Cobb should be suspended from the practice of law for three months.  It is, therefore,

[¶2]    **ADJUDGED AND ORDERED** that the Board of Professional Responsibility's Report and Recommendation for Three-Month Suspension, which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court; and it is further

[¶3]    **ADJUDGED AND ORDERED** that, as a result of the conduct set forth in the Report and Recommendation for Three-Month Suspension, Kent C. Cobb shall be suspended from the practice of law for three months, with the period of suspension to begin April 8, 2026; and it is further;

[¶4]   **ADJUDGED AND ORDERED** that, during the period of suspension, Respondent shall comply with the requirements of the Wyoming Rules of Disciplinary Procedure, particularly Rule 21 of those rules.  That rule governs the duties of disbarred and suspended attorneys; and it is further

[¶5]   **ORDERED** that, pursuant to Rule 25 of the Wyoming Rules of Disciplinary Procedure, Mr. Cobb shall reimburse the Wyoming State Bar the amount of $50.00, representing the costs incurred in handling this matter, as well as pay the administrative fee of $750.00.  Mr. Cobb shall pay the total amount of $800.00 to the Wyoming State Bar on or before April 17, 2026.  If Mr. Cobb fails to make payment in the time allotted, execution may issue on the award; and it is further

[¶6]   **ORDERED** that the Wyoming State Bar may issue the agreed press release contained in the Report and Recommendation for Three-Month Suspension; and it is further

[¶7]   **ORDERED** that the Clerk of this Court shall docket this Order of Three-Month Suspension, along with the incorporated Report and Recommendation for Three-Month Suspension, as a matter coming regularly before this Court as a public record; and it is further

[¶8]   **ORDERED** that, pursuant to Rule 9(b) of the Wyoming Rules of Disciplinary Procedure, this Order of Three-Month Suspension, along with the incorporated Report and Recommendation for Three-Month Suspension, shall be published in the Wyoming Reporter and the Pacific Reporter; and it is further

[¶9]   **ORDERED** that the Clerk of this Court cause a copy of this Order of Three-Month Suspension to be served upon Respondent Kent C. Cobb.

[¶10]  **DATED** this 8th day of April, 2026.

BY THE COURT:

/s/

**LYNNE BOOMGAARDEN**
**Chief Justice**

IN THE SUPREME COURT
STATE OF WYOMING
FILED

MAR - 5 2026

*[signature]*
SHAWNA GOETZ, CLERK

**BEFORE THE SUPREME COURT**

**STATE OF WYOMING**

| | | |
|---|---|---|
| *In the matter of* | ) | |
| *KENT C. COBB,* | ) | |
| *WSB #8-6998,* | ) | *BPR No. 2025-074* |
| | ) | |
| *Respondent.* | ) | D-26-0001 |

---

## REPORT AND RECOMMENDATION FOR THREE-MONTH SUSPENSION

---

THIS MATTER came before a Review Panel of the Board of Professional Responsibility of the Wyoming State Bar ("BPR") on February 19, 2026, for a hearing via Zoom teleconference pursuant to Rule 12, W.R.Disc.P. Review Panel members John C. Brooks (chair), Joelle Hadley-Day and Tandy Dockery were in attendance. The Wyoming State Bar was represented by Bar Counsel, Mark W. Gifford. Respondent Kent C. Cobb ("Respondent") as well as his counsel, Anna Reeves-Olson, were present.

Based upon the parties' Stipulation for Three-Month Suspension and Respondent's Affidavit of Conditional Admission, the Review Panel unanimously FINDS, CONCLUDES and RECOMMENDS as follows:

### Findings of Fact

1.      Respondent has been licensed to practice law in Wyoming since February 1, 2023, but was admitted to practice law in 1993. As set forth in detail below, Respondent conditionally admits that he violated Rules 1.1, 1.3, 1.4 and 8.4(c) of the Rules of Professional Conduct in his representation of Jennifer Randall in a debt collection lawsuit.

2. On November 26, 2024, Discover Bank filed suit against Jennifer Randall in the Circuit Court for the Third Judicial District, Uinta County, Wyoming, seeking collection of $2,595.85.

3. Ms. Randall was served with the summons and complaint on December 11, 2024. Under the Rules of Civil Procedure for Circuit Courts, her answer to the complaint was required to be filed on or before December 31, 2024.

4. On December 17, 2024, Ms. Randall sent Respondent an email with her case information, including a copy of the summons and complaint. On that day, Respondent forwarded Ms. Randall's email and attachments to his legal assistant, Rachel McDaniel, with a forwarding note, "This is a LegalEASE case; sounds pretty simple. Wyoming. We just need to file a response within about a week." Thus, it is clear that an attorney-client relationship was formed with Ms. Randall on that date.

5. On December 18, 2024, Ms. McDaniel responded to Respondent with an email stating, "Okay – I will call the county clerk to see if we can email the answer tomorrow." Later the same day she sent Respondent an email stating, "Just got off the phone with the clerk regarding this case. The answer can be mailed to: Ccevs@courts.state.wy.us. A check representing a $1 per page must be mailed to the court house."

6. On January 9, 2025, Ms. Randall sent Respondent an email stating, "This is Jennifer Randall. Just making sure a response was filed? And what the next steps are?"

7. On January 10, 2025, Respondent forwarded Ms. Randall's email to Ms. McDaniel with a transmittal note asking, "Did we ever do this? The client is super super nice and is checking." That day, Ms. McDaniel e-filed a pro se answer for Ms. Randall.

8. On January 16, 2025, the court issued an order setting a scheduling conference in the case for February 24, 2025.

2

9.      On January 27, 2025, Ms. Randall sent Respondent an email with a copy of the notice of setting, stating, "I received this in the mail today. Not sure what it means, or if I'm supposed to go to this or if the lawyers just deal with it. Please let me know it made me really nervous. Thanks so much."

10.     On February 7, 2025, Respondent sent Ms. Randall an email stating, "Hey Jennifer. We are trying to settle this, but you need to make sure and go to this hearing if we do not. Simply ask for a continuance because we are trying to settle this."

11.     On February 21, 2025, Respondent sent Ms. Randall an email stating, "Jennifer – Remember to go to this hearing on Monday. Just ask for a continuance, because your settlement attorney is negotiating." Ms. Randall responded, "Perfect. I have is [sic] scheduled out to make sure I'm there. Thank you."

12.     After the scheduling conference, on the afternoon of February 24, 2025, Ms. Randall sent the following email to Respondent and Ms. McDonald: "Attached are pictures of what they gave me today. They set a new notice of setting for 3/24/2025 at 2:00 p.m. They told me to make sure that I get you to submit an entry of appearance to the court as soon as possible before then. I'm not sure what that is but I told them I would. Attached is the new notice of setting paper and the sticky note the judge had the court lady write. Thank you." Attached to the email were copies of the new notice of setting as well as a yellow sticky note with the following hand-written note: "We need an Entry of Appearance filed by him to the court, next hearing 3/24/25 2:00 p.m."

13.     Ms. McDaniel responded to Ms. Randall's email with, "I will handle this today and send you a copy. It has to be mailed to the clerk." Ms. McDaniel apparently failed to understand that Respondent's entry of appearance could be e-filed.

3

14. Late in the afternoon on February 24, 2025, Respondent chimed into the email string, "I will have to see if they charge for that. If so, you would have to pay for it. We just need to settle this. That's the main thing. Because if we don't settle it, you are going to get a judgment against you."

15. Ms. Randall responded to Respondent's email with, "I was told it's just a formal declaration to the court that you are representing me as my attorney. Which I assume was already done since I was matched with you in December and Discover had been notified you are. But the court is asking for it, so I'm not sure. I'm sure if extra billing is required you'd need to reach out to legalEASE. Or I can if you'd prefer? I hope we can negotiate it before then as well, that's just what the judge asked me to ask you."

16. No entry of appearance was filed on February 24, 2025. A telephone call to the clerk of court's office would have confirmed that there is no fee for filing an entry of appearance.

17. On March 24, 2025, Respondent's entry of appearance was filed.

18. The March 24 scheduling conference was reset for April 14, 2025. On the afternoon of April 14, 2025, Respondent sent an email to Ms. Randall stating, "I'm about to go to this hearing. What are you offering to settle this?" Ms. Randall responded a few minutes later, "I have no idea, when do I need to know by? If it's today. Why am I just being asked? My husband lost his job on the 12th. I need more information on what the options are."

19. There was apparently a technical glitch with the April 14 scheduling conference. That afternoon, Respondent sent an email to Amanda Lee, counsel for Discover Bank, with the subject line, "Sorry for the technical issues: "I was actually on the hearing on time, but no one ever let me. The client, Ms. Randall, would like to offer $80/month for 24 months to settle this."

20. Ms. Lee responded to Respondent's email a few minutes later, stating, "It sounds like they will be reaching out to us to reschedule the CMC [case management conference] in

4

about 30 days. If you have an offer to send over, you can forward the offer, total monthly income, total monthly expenses, and a description of your client's hardship information to offers@jrllawoffice.com. You can cc me on the email if you would like, but routing it directly to this department is the most efficient because it goes directly to my legal assistants that actually send the offers on to the client."

21.     Later in the afternoon of April 14, 2025, Respondent sent an email to Ms. Lee with the subject line, "Offer for Jennifer Randall": "Yes, that is the offer. $80/month for 24 months. Client is disabled and has no garnishable income or assets."

22.     Ms. Lee responded to Respondent's email two days later, on April 16, 2025, asking, "Is she able to do payments of $87.00 for 24 months for a total settlement of $2,088.00?" Ms. Lee's email prompted a flurry of emails between Respondent, Ms. Lee and Ms. Randall, as detailed below.

23.     Respondent forwarded Ms. Lee's email to Ms. Randall with the note, "See note below. Do you accept the offer?"

24.     Ms. Randall responded to Respondent's email five minutes later, stating, "Yeah that works for me, did they reject the lump sum offer?"

25.     A few minutes after Respondent received Ms. Randall's email, Respondent responded to Ms. Lee's email with, "They are also offerings [sic] $1500 lump sum to settle it." It is apparent from these last two emails that Ms. Randall had authorized Respondent to make a lump sum offer of $1,500.00 which Respondent failed to convey promptly.

26.     Ms. Lee responded to Respondent's email six minutes later, stating, "I already have approval for the $2,088 in 24 months, so I would prefer to get your client's acceptance or rejection of that offer before submitting a new lump sum offer to my client. I understand that your client's income may likely be all exempt from garnishment, but I would still need to the

5

amount of monthly income and monthly expenses and hardship information in order to submit your client's lump sum offer. Please let me know if your client would like to accept the settlement over 24 months, and if so what date she would like her payments due so I can send over a proposed agreement for her signature, or alternatively if she would prefer to provide the income, expense, and hardship information I need to submit her lump sum offer to Discover."

27. Respondent responded to Ms. Lee twelve minutes later with, "Let's do the 24 months."

28. One minute later, Respondent sent the following email to Ms. Randall: "Apparently they rejected that. You can always pay this offer. But it gets you 24 months of no interest. Let's accept this offer and then she can still go back and try to talk her client into accepting the lump sum." Respondent apparently neglected to inform Ms. Randall at this time what information Discover Bank would need in order to consider a lump sum offer.

29. Ms. Lee then responded to Respondent's email, stating, "What date should I list for the payments to be due? Typically they would want to see the first payment of this month yet, but if that's not possible for your client, I would need to have payments start by May 15th at the very latest. If we go out as far as May 15th for the first payment, please stress to your client the importance of us receiving that first payment on time because I must have the first payment in-house by that date."

30. Next, Respondent sent an email to Ms. Randall, asking, "Will you make the first payment by April 30?" Ms. Randall responded a few minutes later, stating, "Yeah. I'd have to know how and where. But yeah." Thus ends the email communication between Respondent, Ms. Randall and Ms. Lee on April 14, 2025.

31. More than two weeks later, on April 29, 2025, Ms. Randall sent Respondent an email asking, "I still need to know how to make the first payment if it's due tomorrow?" Respondent responded with, "The note below has their address."

32. Clearly confused, Ms. Randall responded, "The only way to pay is through the mail to a law firm? I guess I can order a checkbook but I have no way to get a receipt that way. Is there a settlement document somewhere?"

33. Approximately one hour later, at 8:03 p.m. Central Time, Respondent responded to Ms. Randall, "For at least the first one, until you can work it out with them, just go get a cashiers check from my [sic] convenience store. Take a picture of it."

34. Ms. Randall replied five minutes later, asking, "Okay, can I get the settlement documents? Don't I need to sign something?" Respondent responded a few minutes later, "No, you don't need to sign anything. In this case, the email from the opposing counsel is all we need."

35. On May 6, 2025, Ms. Lee filed a motion for summary judgment on Discover Bank's behalf. Under the rules of civil procedure for circuit courts, Ms. Randall's response to the motion was due on or before June 4, 2025. There is no evidence that Respondent informed Ms. Randall that the motion had been filed, its potential consequences or her duty to respond.

36. At 9:23 p.m. Central Time on May 15, 2025, Respondent sent Ms. Randall an email stating, "Did you make that first payment? I just want to make sure you have everything worked out. Otherwise, you're going to have to go to this hearing." It is unclear what "hearing" Respondent was referring to, as there were no upcoming hearings in the case.

37. Ms. Randall responded at 9:42 p.m., "I sent it to the address in the email, the law firm (it's the only address there was), I didn't send it certified mail so I have no idea if they got it or how to even tell?"

7

38. Respondent replied at 11:06 p.m., "Go ahead and email them or call them and see if they got it."

39. Ms. Randall responded a few minutes later, "I will, thank you again."

40. On May 19, 2025, Respondent sent the following email to Ms. Randall: "Jennifer, I went to this hearing today. They tried to get a summary judgment because you had not sent your payment? Did you mail it into the opposing counsel? When we talked a few days ago, I understood that's what you were going to do. I got this continued until June 23 at 2 o'clock. I have not seen any agreement that they sent me, but they are going to send me one, and you also need to mail in the payment to them."

41. Ms. Randall responded, "Okay, I will call the number in that email when I can, unfortunately I'm chaperoning at Teton science for my son and they don't allow electronics to be turned on during certain hours so it's been hard to check emails. I'll also check usps to see if it got sent back while I've been gone. I can send another check Friday when I get back. I really don't want to send another $80 without any clue if they re getting it, how to check my balance etc. If you could send me an agreement that would help me feel more comfortable with all this. Also a way to pay online if they have it because I'll just be honest I'm not going to remember to get a cashiers check every month and snail mail it."

42. The same afternoon, Ms. Lee sent Respondent the following email: "I think the confusion this afternoon was over the terms of the agreement never getting finalized. We were supposed to get an exact due date for the payments in order to draft an agreement and I was supposed to have the first payment by May 15th at the latest. The email string below is where my records indicate things dropped off. I can try to get re-approval for the settlement terms, but the payments would really need to start in May. Is that still possible? If so, what date can your client make payments by each month?" Ms. Lee's reference to the "email string below" is to the email

8

communication between Respondent and Ms. Lee on April 16, 2025 (*see* item 28 above). There is no evidence that Respondent ever responded to Ms. Lee's earlier email.

43. Then Respondent simply handed the problem over to Ms. Randall. Respondent forwarded Ms. Lee's email to Ms. Randall, stating, "Jennifer, I am having you respond to the email questions below. I don't need to be in the middle of that, and I need you to set the payment date and arrange payments with the opposing counsel."

44. Ms. Randall's initial response to Respondent's email reiterated her earlier requests for a signed settlement agreement:

Hi Kent,

Thank you for forwarding the messages.

Before I proceed with any additional payments, I'd like to request a formal, signed agreement that outlines the terms, payment structure, and obligations for both parties. While I understand that emails can document discussions, I'm not comfortable moving forward based solely on forwarded correspondence – especially given that this involves an official court case.

Additionally, I noticed the payment is being directed to the law firm rather than Discover. Without a formal agreement clearly stating that they are the proper entity to receive payment, I'm hesitant to proceed. I want to ensure everything is handled properly, transparently, and with the appropriate documentation.

I'm happy to accept the terms once I receive a formal document that clearly outlines how to pay, who to address the payment to, and who will legally own the settled debt. Please let me know when I can expect the finalized agreement, and I'll review it promptly.

45. On the evening of May 19, 2025, having had the opportunity to review the contents of Respondent's April 16, 2025, email communication with Ms. Lee, Ms. Randall sent Respondent the following email:

Hi Kent,

After reviewing the email correspondence between you and opposing counsel, I notice something deeply troubling. In Amanda Lee's email dated April 16, she made it clear that a lump sum hardship offer could still be submitted if I provided

9

information about my income, expenses, and overall financial situation. She specifically asked for this in order to proceed with that option.

However, you told me that the lump sum offer had already been rejected, and at no point did you mention I could still pursue a hardship settlement by submitting this information. Given that my husband had just lost his job, and I've undergone several back surgeries in the last few years leaving me unable to return to work as of yet, I believe I have absolutely qualified for this option had you presented it to me when she asked. I also wrote about my hardships in my first email to you with the initial document served to me Dec 17th. I have since undergone additional hardship with household job loss before that email was sent to you.

I need to understand why this was never communicated to me. The failure to inform me of this option – on that could have drastically reduced my financial and emotional burden – feels like a serious oversight, if not outright negligence.

This entire process has caused me significant anxiety, and I trusted you to inform me of all my options. Please provide a clear explanation of why this hardship option was not discussed or pursued when it was clearly offered by opposing counsel.

46. Respondent responded to Ms. Randall's email the same evening:

I did communicate that to you. We communicated that to you in the first email communication, and then in subsequent communications. That's always an option. But you said you had nothing lump sum to offer.

You can always get the best offers in a lump sum, including right now.

We always make the known in the very first communication we ever have with you, and we did. Look at the email.

It's still an option. We even prefer it because we can get the best deal. But you said you didn't have any lump sum to offer.

47. Several minutes later, Respondent added: ""P.S. Your very low lump sum offer was rejected. Then you could not raise it, you said."

48. Ms. Randall replied,

Hi Kent,

I reviewed our recent correspondence and want to point some thing out for clarification.

You stated that the lump sum hardship offer was rejected and that I had said I had nothing to offer. However, in your own email to opposing counsel dated April 16 at 10:04 AM, you wrote: "They are also offering $1500 lump sum to settle it." This confirms that the lump sum was not rejected – it was presented as an active option.

Moreover, Amanda Lee's follow-up message made it clear that she was waiting on financial and hardship information from me to proceed with that offer. That request was never shared with me. If it had been, I would have gladly provided that information, as I stated in my email and earlier communication.

At this point, I need to understand the following:

1. Why this information was withheld from me.
2. Why I was told that it had already been rejected.
3. How I was supposed to pursue a hardship settlement if I was never given the opportunity to provide my hardship.

This has had real financial and emotional consequences. I would appreciate a direct and honest explanation.

**Attached are screenshots of your email to her offering the $1,500 lump sum and her reply asking for documentation to apply for it. (Both dated April 16th)

49.     Respondent next wrote:

**Nothing was withheld from you. I asked you for that information.**

The settlement is still ongoing if you want to change it. I have begged you for information. You said you had nothing else to offer.

*They did reject the offer. I talk to these attorneys on the phone. You're not seeing all of the communication.*

You can still provide your hardship information, as I have asked for over months [sic]. Nothing is done yet.

But you cannot keep wasting my time by not providing me with information. Provide me with all the information you can. Make it the best description you can.

**They will always consider a lump sum, but they won't consider a lump sum low like you had. And they're typically not going to just give you money, even if you have a bad hardship. It all depends on the creditor.**

Send me all your info ASAP.

[Bold type and italics in original.]

11

A few minutes later, Respondent added:

> P.S. I have no incentive to withhold any information from you or not get the low-est possible settlement. It actually helps me if you get me the information more quickly. When these get drawn out, and a client tells me they have nothing else more they can offer, and then will provide detailed hardship information ... it does not help anyone.
>
> **Again, like I say, nothing has been finalized. If you have hardship information, and they are feeling generous, it would be awesome if you can come up with a lump sum I can offer them. But you have never told me what that is, and we can't play games with them.**

50.     Ms. Randall replied:

> Hi Kent,
>
> Attached is the screenshot of your message from April 16, where you told me the lump sum offer was "apparently rejected." This directly contradicts Amanda Lee's message sent to you just 18 minutes prior, which clearly stated that a hardship sum could still be considered if financial information was provided. Nowhere did you explain that I could still pursue that option by submitting documentation.
>
> Your current claim – that you "begged me" for that information and I've been the one delaying – does not match the written record. At no point did you explain what was needed for the hardship offer or indicate it was still on the table. Instead, you said it was already rejected and immediately shifted me toward the monthly plan.
>
> This is not a matter of miscommunication – it's a clear failure to relay a critical financial option that opposing counsel explicitly offered. I am providing this as a documented example of my concern and will be including it in my formal complaint.
>
> PS reply: Final Clarification on Hardship Option and Communication Breakdown
>
> I understand your position, but the record is clear. You told me the lump sum offer was rejected – full stop. You never explained that a hardship-based lump sum was still available pending the submission of financial documentation, even though Amanda Lee outlined that exact option in her April 16 email to you.
>
> You didn't forward that email to me until over a month later, and only after I asked for verification of the settlement terms. At no point did you give me instructions to submit hardship information past what you asked me to include in my very first email – which I did – nor did you clarify that the $1,500 lump sum was conditional or improvable based on documentation.

This isn't about incentives – this is about informed representation. I was never given the chance to make an informed choice. I didn't even know it wasn't rejected until you asked me to do your job for you by forwarding me their emails and I'm now in a worse financial and legal position because of it. You may believe you communicated effectively, but I have emails showing you told me this option was off the table when it was not.

** Screenshot of you telling me it was "apparently rejected" and first email outlining hardship like you requested in our consultation. If you have any documentation that you asked me about hardship outside of the emails I've scoured, I'd love to see them?

51.     Having been called out on his misstatements, Respondent changed tack:

P.P.S. Nothing has been settled or finalized, so there has been no effect on your finances or other elements.

I looked back through some of the correspondence, and I see what you are saying. I talk to opposing counsel on the phone, and there was something that she said that made me think they were going to accept it regardless. I may have gotten mixed up on it myself.

**Fortunately, it has not had any financial or [sic] impact on you, because if they would accept it, based on what you provide, they still will.**

*So here's what we need you to do, for sure: Provide your best hardship situation. And then what you can offer in terms of lump sum.*

I definitely want to help you, and it's possible I may have mixed up communication, but I definitely would never try to. Fortunately, it has had no impact. These cases take forever.

52.     Ms. Randall's response:

Kent,

Thank you for your follow-up.

I appreciate you acknowledging that there may have been a miscommunication or mix-up regarding the lump sum hardship settlement. That said, the direct statement that it had been "rejected" was presented to me as final, which understandably influenced my decisions and caused a great deal of stress.

I was never told that the hardship information could still be submitted before today's correspondence, nor was I asked for it after that April 16 exchange. I would have absolutely provided it, and I find it deeply concerning that such an important

13

option was not communicated clearly – especially when the written email from opposing counsel made the path forward very clear.

Regardless of whether the matter is technically "finalized," this delay and lack of communication had a significant emotional and procedural impact on me, which could have been avoided with clearer guidance. I also want the record to reflect that I did not feel properly informed throughout the process.

53.    In response, Respondent stated:

Believe me, I try my best to communicate as best as I possibly can. You have been going through financial stress for many years before I ever even met you, and I didn't have anything to do with any of that. I feel bad for you and your family but I did not have any impact on that.

If you would like to find someone else to reach and finalize the agreement with them, that's fine. You still have never told me what you could offer them in terms of the 2nd lump sum offer which, as I understand it, is going to be needed.

Again, everything exists just as it always has. Nothing has changed. You have to still provide all of the information, and they have not promised to accept anything in particular.

Just let me know ASAP. I can't keep spending time on this. I'm losing money on this big time. I can withdraw tomorrow if you would like.

54.    Ms. Randall had clearly had enough. She wrote:

Dear Kent,

This message serves as formal notice that I am terminating your legal representation, effective immediately. I no longer feel that my legal interests have been adequately represented, and I have documented multiple instances of serious miscommunication, lack of diligence, and professional misconduct throughout the course of your handling of my case.

My reasons for terminating this relationship include but are not limited to the following:

• Failure to timely file with the court after I first contacted you on December 17, 2024, resulting in my appearing unrepresented at initial hearings.
• Failure to file a formal Notice of Appearance with the court for months, despite repeated notices and my own efforts to address the issue.
• Repeated delegation of legal duties to me, including instructing me to attend court hearings alone and communicate with opposing counsel directly.
• Misrepresentation of settlement options, including telling me a lump sum offer was "rejected," when opposing counsel had in fact requested financial

14

documentation to pursue it further. This cause unnecessary stress and deprived me of an informed decision.

- Requesting that I send payment to the law firm – rather than Discover – without providing a signed settlement agreement clearly outlining the terms, even after opposing counsel requested formal documentation. This left me fully unprotected and legally vulnerable.
- Dismissive, contradictory, and gaslighting responses when I questioned your handling of my case.
- Mischaracterizing a court-related letter – clearly addressed to your law office – as having been "accidentally mailed to you instead of me," which further delayed my understanding of the case and misled me regarding its legal significance.

This experience has had a significant and lasting toll on me. As someone with panic disorder, ADHD, and degenerative disc disease, I sought legal representation in hopes of reducing my anxiety and protecting my stability. Instead, I was repeatedly put in confusing and high-pressure situations that worsened my mental health and left me feeling abandoned during an already vulnerable time. What I needed was guidance and clarity. What I received was dismissal and blame.

I am requesting that you send me a complete digital copy of my file, including all communications with Discover's counsel, all filings, and any documents related to proposed settlements. Please send this no later than May 24, 2025.

Additionally, I will be filing a formal complaint with the Wyoming State Bar, Veritas Legal Plan, and LegalEASE regarding your conduct and the harm caused by your representation. I will be submitting supporting documentation including email correspondence, screenshots, and recorded phone conversations. If you believe there is anything material that should be considered before I proceed, you may reply.

I will also be informing opposing counsel that I am now self-represented moving forward, to ensure all future communications and case matters are handled directly.

Finally, your last message to me – implying that my financial hardship over the past two years from a severe condition somehow excuses or justifies the confusion and stress your representation has cause – was not only unprofessional, but deeply manipulative. Suggesting that you have "lost money" by representing me and that I am "wasting your time" is both cruel and inappropriate, especially given the repeated failures to properly inform, support, or advocate for me throughout this process. The language you used was dismissive, emotionally invalidating, and served only to shift blame and diminish my very real concerns.

55.     Twenty minutes later, Respondent replied:

Jennifer,

15

I do not have any digital copies of anything you have not seen, and I will not be providing you with anything further.

I have spent an extra extraordinary [sic] amount of time on your relatively small case. And now you are complaining. Everything that was available is still available to you, but yet you complain.

You have everything that is there except for phone communications with opposing counsel, which were important. Phone communications with opposing counsel affected what I told you and I told you everything I had in the best possible way.

I will be more than eager to explain the major work my paralegal and I did on this case – to the Wyoming Bar Association, LegalEASE, Veritas or anyone else. A while back, my paralegal asked me why I was spending so much time on tis case. My work has done nothing but benefit you. That is easy to prove.

As you yourself mentioned at different points, you have been under stress from your own family personal situations that have nothing to do with me.

For a relatively small case, I have been to multiple hearings and spent an extraordinary amount of time going back-and-forth between you and the creditors [sic] representative. You may not care at all whether I have lost money on this case, but that is not considerate of you.

Regardless, you can complain about me all you want, but it does not affect that fact that I did a good job for you. My paralegal and opposing counsel know it.

At your request, I will be withdrawing from this case tomorrow.

56.     Respondent ended the May 19, 2019, email conversation with Ms. Randall on the following note:

See below – I stated to you that they had rejected your $1,500 offer, which they did, without other financial and hardship info. And you had not provided any hardship info that I had not told them already.

**I didn't want you to get a judgment, so you and I both agreed that you would accept their 24 pay offer and then try to get the opposing counsel to talk their client into accepting the $1,500 lump sum, which they earlier rejected.**

We are still at that stage now, but at your request I am withdrawing.

57.     Two days later, on May 21, 2025, Respondent sent the following email to Ms. Randall:

16

I am withdrawing today. As you know, your case is settled with the interest-free payments, at a 20% reduction, over 2 years. Unless you purposely sabotage that, and we are not responsible for that.

Second, once you made the first payment, we were going to start pressing them to do a lump sum settlement and specifically said that to you in writing. We simply were going to have to have other information from you (though I had told them you had no garnishable income and only one income) and then we were going to press for a lump sum offer.

58.     A few minutes later, Respondent added, "I also let the Opposing Counsel know I am withdrawing today."

59.     Ms. Randall replied:

Dear Mr. Cobb,

As I previously stated in my formal termination letter, I am no longer your client and respectfully request no further contact unless it directly pertains to providing my complete case file.

Please ensure that all documents, including communications with opposing counsel and any filings related to my case including your withdrawal with the courts, are sent to me by May 25th 2025, as originally requested.

Any further communication unrelated to this request will be considered unwelcome.

60.     A few minutes later – Respondent sent an email to Ms. Randall from Ms. McDaniel's email address that stated:

Hello Ms. Randall,

We understand that you are feeling frustrated and upset about the current state of your case, and we want to take a moment to address your concerns with the care and attention they deserve.

First, we want to reaffirm that your case is currently set up with an interest-free payment plan, which includes a 20% reduction over a two-year period. It's important to note that this arrangement will remain in effect unless there are deliberate actions that could jeopardize it. We are committed to ensuring that you are not held responsible for any unforeseen issues that may arise.

Once opposing counsel received your initial payment, our intention was to actively pursue a lump-sum settlement on your behalf. This plan communicated to

17

you in writing, highlighting that we would require additional information from you to proceed effectively. We want to reassure you that it was conveyed to opposing counsel that you have no garnishable income and rely solely on one source of income.

We want to clarify that at no point did we misrepresent the settlement offers. For several months, you expressed a desire for a structured monthly payment plan, and that is precisely what we pursued with opposing counsel.

On April 14, prior to your hearing, we reached out to you to discuss potential offers for settling the case. We understand that you were feeling uncertain, particularly given the recent job loss your husband experienced. We provided you with a general outline of possible offers, and we entered the hearing with your best interests in mind. Following our discussions, a proposed offer of $80 per month for 24 months was made, which reflects roughly a 25% reduction.

Two days later, on April 16, we received a counteroffer from the opposing counsel for payments of $87 per month over the same 24-month period. We promptly communicated this to you and inquired whether you would accept the offer. Your response indicated that it was acceptable, and you asked about the status of the lump-sum offer. We noted that her phrasing suggested some flexibility, as she expressed a preference while also indicating a willingness to discuss further options.

Throughout this process, there has been considerable back and forth among multiple parties, and we focused on maintaining a positive rapport with opposing counsel to facilitate future negotiations regarding the lump sum. My earlier remark about "apparently they rejected that" was in reference to the opposing counsel's reluctance to submit a lump-sum offer until we reached a settlement on the monthly payments. Given your preference for this payment method, especially considering your husband's recent job loss, we believed it prudent to accept the current offer. This strategy would allow us to keep the lines of communication open with the opposing counsel, potentially leading her to advocate for a lump-sum acceptance later.

We want to emphasize that it was specifically stated that pursuing a lump sum was still a possibility, including the lump sum that the opposing counsel was hesitant to submit until we reached an agreement on the payment plan. Our intention has always been to work towards that lump sum for you, and we believed this was communicated clearly.

We understand that it can be easy to nitpick details within multiple email exchanges, especially given the rapid back and forth among three or four parties. We want to assure you that there was absolutely no intention on my part to withhold a lump sum offer from you. While I may not always express myself perfectly in every word or paraphrase, my focus has been on conveying the strategy that would ultimately benefit you. We recognize that I missed the contradiction in the

18

opposing counsel's language, but my commitment remained to pursue the best possible outcome without any intention to misrepresent the situation.

In fact, the current arrangement provides you with the flexibility to manage your payments interest-free for two years, which is especially important given your husband's job situation.

Regarding your concerns about timely filings and representation, we want to clarify a few key points:

We did not fail to timely file with the courts. As a presumed referral, we do not have prior knowledge of potential cases until they are referred to us. We are not required to do any work on our law partner referrals that are not covered under the member benefits. This is sometimes a timely process to verify what services are covered. Furthermore, our commitment is to assess the facts before making any decisions. In many instances, including yours, we provide guidance without formal representation. In your case, we have provided legal representation for over five months, paying out of pocket for filing fees, and attending hearings with no compensation to date.

Under Wyoming law, specifically Wyo. Stat. § 1-21-201(b), the rules regarding small claims do not require defendants to file an answer or any responsive pleadings in response to a claim. The statute explicitly states that in small claims actions, the defendant is not obligated to respond to the claim unless the court orders otherwise. This provision is designed to simplify the process for defendants and encourage resolution without the need for formal pleadings.

Additionally, Wyo. Stat. § 1-21-201(c) further emphasizes that small claims proceedings are intended to be informal and expeditious, allowing parties to present their cases without the complexities often associated with traditional litigation. This means that if you choose not to file an answer, the court will still proceed with the case.

It is important to be aware of your rights and options in these proceedings. While it is not mandatory to file an answer, may still choose to do so if you wish to present your side of the case or challenge the claims made against you.

2. When you reached out to us in December 2024, Wyoming had not yet implemented remote hearings. As we are not physically located in Wyoming, we are unable to attend the hearings you had scheduled for January. During our conversation, you expressed that you did not want to incur the expense of hiring local appearance counsel. As a result, we advised you to request a continuance, which you successfully did. Subsequently, Kent was able to attend your later hearings once remote hearings became available.

3. We want to clarify that you did not have to attend the hearing "alone." We informed you that hiring appearance counsel was an option, but you decided against

that. Our goal was to provide you with the best possible guidance and options while respecting your preferences and financial considerations.

4. Additionally, we would like to address the nature of settlement agreements in cases like yours. It is common for the emails exchanged between attorneys to serve as the basis of the agreement, often without a formal settlement document being drafted. In my experience over the years, we estimate that in over 50% of the cases, an actual written settlement document was not created. We had not seen any settlement document from the opposing counsel, and we wanted to ensure that the agreement was not withdrawn due to any missed payments on your part. Therefore, we recommended, as we have with many other clients, that you go ahead and send the payment. This often helps to "lock in" the agreement by demonstrating your commitment with the first payment. Kindly find opposing counsel contact information below, and be advised that the payments can be made directly on Rodenburg Law Firm's (opposing counsel) website at the following web address:

https://payrodenburg.com/payment#/payment/legalDisclaimer

Opposing Counsel Co [sic]
Amanda Lee
Rodenburg Law Firm
300 N.P. Avenue, Suite 105
P.O. Box 2427
Fargo, ND 58108-2427
aleewiebolt@rlawoffice.com

We hope this clarifies our position and the steps we have taken on your behalf. Your concerns are valid, and we want to ensure that you feel supported and informed every step of the way. Under Wyoming law, specifically Wyo. Stat. § 16-22-308, a client has a right to terminate the attorney-client relationship at any time, and an attorney must comply with the client's request to withdraw from representation. We respect your decision and will ensure that the transition is handled smoothly and professionally.

There is an upcoming Case Management Conference schedule in your case that is set at the following date, location and time:

"The hearing is set for the [sic] 6/23/2025 at 2:00 PM at the Circuit Court of the Third Judicial District, Uinta County, 225 9th Street Evanston, Wyoming 82930."

A copy of the above hearing notice, the entry of appearance, answer, and formal withdrawal are attached for your records.

Please feel free to reach out if you have any further questions or if you would like to discuss your options moving forward.

20

Warm regards,

Kent Cobb Law, P.C.

The email contains misrepresentations, misstatements and inaccuracies which are further detailed below.

61. On May 28, 2025, the Office of Bar Counsel (OBC) received Ms. Randall's complaint against Respondent. The OBC asked her for additional information.

62. On June 9, 2025 – several days after the deadline to file a response to Discover Bank's motion for summary judgment had passed – the court entered an order granting Respondent's motion for leave to withdraw. There is no evidence that Respondent provided Ms. Randall with a copy of the motion for summary judgment, informed her of the deadline to respond or advised her of the potential consequences of not responding.

Misrepresentations, Misstatements and Inaccuracies in the May 21 Email

63. *"We did not fail to timely file with the courts."* Respondent did not timely file an answer on Ms. Randall's behalf. Respondent did not timely file an entry of appearance. Respondent neglected to file a response to Discover Bank's motion for summary judgment. The only thing Respondent timely filed was his motion to withdraw.

64. *"We are not required to do any work on our law partner referrals that are not covered under the member benefits."* The record is clear that Respondent formed a lawyer-client relationship with Ms. Randall on December 17, 2024 (*see* item 4 above). From that date forward, Respondent was required to abide by the Rules of Professional Conduct in his representation of Ms. Randall, including the duty of diligence (Rule 1.3) and the duty to communicate with the client (Rule 1.4).

65. *"Under Wyoming law, specifically Wyo. Stat. § 1-21-201(b), the rules regarding small claims do not require defendants to file an answer or any responsive pleadings in response*

21

*to a claim. The statute explicitly states that in small claims actions, the defendant is not obligated to respond to the claim unless the court orders otherwise. This provision is designed to simplify the process for defendants and encourage resolution without the need for formal pleadings."* This was not a small claims court case.

66. *"Under Wyoming law, specifically Wyo. Stat. § 1-21-201(b), the rules regarding small claims do not require defendants to file an answer or any responsive pleadings in response to a claim. The statute explicitly states that in small claims actions, the defendant is not obligated to respond to the claim unless the court orders otherwise. This provision is designed to simplify the process for defendants and encourage resolution without the need for formal pleadings."* Because this was not a small claims court case, the Rules of Civil Procedure for Circuit Courts required that a timely answer to the complaint be filed.

67. *"When you reached out to us in December 2024, Wyoming had not yet implemented remote hearings."* Remote hearings in all Wyoming circuit courts were implemented by 2021 at the latest.

68. *"Additionally, we would like to address the nature of settlement agreements in cases like yours. It is common for the emails exchanged between attorneys to serve as the basis of the agreement, often without a formal settlement document being drafted. In my experience over the years, we estimate that in over 50% of the cases, an actual written settlement document was not created. We had not seen any settlement document from the opposing counsel, and we wanted to ensure that the agreement was not withdrawn due to any missed payments on your part."* The reason Respondent had not seen any settlement document from Ms. Lee is that Respondent failed to respond to her email asking what date Ms. Randall would like her payments due so Ms. Lee could "send over a proposed agreement for Ms. Randall's signature," or alternatively if Ms. Randall "would prefer to provide the income, expense, and hardship information I

22

need to submit her lump sum offer to Discover" (*see* item 29 above). Similarly, Respondent failed to inform Ms. Randall that she had the option of providing income, expense and hardship information that would need to accompany any lump sum settlement offer.

69.    *"Under Wyoming law, specifically Wyo. Stat. § 16-22-308, a client has a right to terminate the attorney-client relationship at any time, and an attorney must comply with the client's request to withdraw from representation."* When Bar Counsel asked Respondent about the reference to Wyo. Stat. § 16-22-308, Respondent stated the statute "deals with the recovery of attorney's fees in civil actions related to contract or specific types of commercial claims." Actually, there is no Wyo. Stat. § 16-22-308. Respondent went on to assert that the email should instead have referenced "044-32 Wyo. Code R.Section 32-9 – Appearances and Withdrawals. This regulation details the specific steps an attorney must take when filing a motion to withdraw from a contested case, including providing reasonable efforts to give actual notice to the client about the withdrawal and its implications." In point of fact, 044-32 Wyo. Code R.Section 32-9 is a regulation applicable to contested cases before the Wyoming Insurance Department. The proper citation is WY Rules and Regulations 044-0002.32 § 9 (325). It has no application whatsoever to withdrawals from circuit court proceedings. Respondent's assertions on this point raise significant questions regarding his competence as well as his honesty.

70.    As evidenced by his affidavit of conditional admission, Respondent concedes that there is clear and convincing evidence that he violated Rule 1.1 (competence), Rule 1.3 (diligence), Rule 1.4 (duty to communicate with client) and Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation) of the Wyoming Rules of Professional Conduct.

71.    Respondent's Rule 1.1 violations include:

23

1. Failing to recognize and acknowledge that he formed a lawyer-client relationship with Ms. Randall on December 17, 2024.

2. Citing a non-existent Wyoming statute in the May 21, 2025, email to Ms. Randall.

3. Failing to recognize that 044-32 Wyo. Code R.Section 32-9 has no application to circuit court matters.

72. Respondent's Rule 1.3 violations include:

1. Failing to timely file court documents, as discussed above.

2. Failing to attend the February 24, 2025, scheduling conference on Ms. Randall's behalf.

3. Failing to convey Ms. Randall's $1,500.00 lump sum settlement offer in a timely manner.

4. Failing to respond to the questions Ms. Lee posed in her April 14, 2025, email.

5. Failing to inform Ms. Randall of the information Ms. Lee would need to have in order for her client to consider a lump sum offer from Ms. Randall.

6. Failing to follow through on getting a signed settlement agreement.

7. Forwarding his May 19, 2025, email communication with Ms. Lee to Ms. Randall and directing her to answer Ms. Lee's questions.

73. Respondent's Rule 1.4 violations include:

1. Failing to inform Ms. Randall of the information Ms. Lee would need to have in order for her client to consider a lump sum offer from Ms. Randall.

2. Failing to inform Ms. Randall that Ms. Lee filed a motion for summary judgment, the potential consequences of such a motion and the need to timely file a response.

3. Citing non-existent or otherwise applicable law in the May 21, 2025, email to Ms. Randall.

74. Respondent's Rule 8.4(c) violations include:

1. Telling Ms. Randall that Discover Bank "apparently" rejected the $1,500.00 lump sum settlement offer when Discover Bank told me that they needed more information to support the lump sum offer that Respondent conveyed to Discover Bank on April 16, 2025.

2. Telling Ms. Randall Discover Bank would not accept the $1,500.00 lump sum settlement when Respondent did not recognize and communicate that additional information was needed to support the lump sum that he had conveyed to opposing counsel on April 16, 2025. In other words, Ms. Lee was waiting on Respondent to get that information to her.

3. Telling Ms. Randall that remote hearings had not yet been implemented in December 2024.

24

4. Misrepresenting Wyoming law to Ms. Randall in the May 21, 2024, email to her.

## Determination of the Appropriate Sanction for the Misconduct

75. Rule 15(b)(3)(D), W.R.Disc.P., provides, "In imposing a sanction after a finding of misconduct by the respondent, the BPR [Board of Professional Responsibility] shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions:

1. Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
2. Whether the lawyer acted intentionally, knowingly, or negligently;
3. The amount of the actual or potential injury caused by the lawyer's misconduct; and
4. The existence of any aggravating or mitigating factors."

76. Respondent's violations of Rules 1.1, 1.3, and 1.4 call into play Standard 4.4, "Lack of Diligence," of the ABA Standards for Imposing Lawyer Sanctions. Standard 4.4 sets forth the following guidelines:

4.41   Disbarment is generally appropriate when:
    (a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or
    (b) a lawyer knowingly fails to perform services for a client and cause serious or potentially serious injury to a client; or
    (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.
4.42   Suspension is generally appropriate when:
    (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or
    (b) a lawyer engages in a pattern of neglect with respect to client matters and causes injury or potential injury to a client.
4.43   Reprimand [i.e., "public censure" under Rule 9(a)(3) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.
4.44   Admonition [i.e., "private reprimand" under Rule 9(a)(4) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes little or no actual or potential injury to a client.

25

Respondent engaged in a pattern of neglect in his representation of Ms. Randall and caused injury or potential injury. The presumptive sanction for Respondent's violations of Rules 1.1, 1.3 and 1.4 is a suspension.

77.    Respondent's violations of Rule 8.4(c) implicate Standard 5.1, "Failure to Maintain Personal Integrity":

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit or misrepresentation:

5.11    Disbarment is generally appropriate when:
   (a) a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of any other commit any of these offenses; or
   (b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

5.12    Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously reflects on the lawyer's fitness to practice.

5.13    Reprimand [i.e., "public censure" under Rule 9(a)(3) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

5.14    Admonition [i.e., "private reprimand" under Rule 9(a)(4) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer engages in any other conduct that reflects adversely on the lawyer's fitness to practice law.

Several of Respondent's violations of Rule 8.4(c) seriously adversely reflect on his fitness to practice law. The presumptive sanction for Respondent's violations of Rule 8.4(c) is disbarment.

78.    The Preface to the ABA Standards includes the following discussion regarding mental state:

26

The mental states used in this model are defined as follows. The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation of a care that a reasonable lawyer would exercise in the situation.

Respondent's violations of Rules 1.1, 1.3 and 1.4 were negligent. However, several of his violations of Rule 8.4(c) were intentional.

Under the ABA Standards, "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." "Potential injury" is defined as "harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

Respondent's violations of the foregoing rules caused significant emotional distress for Ms. Randall.

79.    ABA Standard 9.0, entitled "Aggravation and Mitigation," provides as follows:

9.1   *Generally*
        After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.
9.2   *Aggravation*
        9.21   *Definition.* Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.
        9.22   *Factors which may be considered in aggravation.* Aggravating factors include:
        (a) prior disciplinary offenses;
        (b) dishonest or selfish motive;
        (c) a pattern of misconduct;
        (d) multiple offenses;
        (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
        (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
        (g) refusal to acknowledge wrongful nature of conduct;
        (h) vulnerability of the victim;

27

(i) substantial experience in the practice of law;

(j) indifference in making restitution; and

(k) illegal conduct, including that involving the use of controlled substances.

9.3 *Mitigation.*

9.31 *Definition.* Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32 *Factors which may be considered in mitigation.* Mitigating factors include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure of disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse when:

(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

(2) the chemical dependency or mental disability caused the misconduct;

(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in disciplinary proceedings;

(k) imposition of other penalties or sanctions;

(l) remorse; and

(m) remoteness of prior offenses.

9.4 *Factors Which Are Neither Aggravating nor Mitigating.*

The following factors should not be considered as either aggravating nor mitigating:

(a) forced or compelled restitution;

(b) agreeing to the client's demand for certain improper behavior or result;

(c) withdrawal of complaint against the lawyer;

(d) resignation prior to completion of disciplinary proceedings;

(e) complainant's recommendation as to sanction; and

(f) failure of injured client to complain.

80.    Aggravating factors applicable to Respondent's misconduct include dishonest or selfish motive; a pattern of misconduct; vulnerability of the victim; and substantial experience in the practice of law. The absence of a disciplinary history is a mitigating factor. In addition, Respondent has recently paid Ms. Randall's debt to Discover Bank out of his own pocket. This is an additional mitigating factor. Further mitigating factors include: (1) Mr. Cobb's sincere remorse; (2) his apology letter to Ms. Randall; (3) his $1,000 donation to Wyoming Legal Aid; and (4) his cooperation to resolve this matter without a hearing.

81.    Respondent concedes that, in consideration of the foregoing factors, a suspension is the appropriate sanction for the conduct to which Respondent has conditionally admitted. Respondent agrees to a three-month suspension.

82.    Ms. Randall was provided with a copy of this Stipulation and the accompanying Affidavit of Conditional Admission and had no objection to the stipulated sanction.

83.    If the Court orders a three-month suspension in accordance herewith, Bar Counsel and Respondent agree to the following press release:

> The Wyoming Supreme Court issued an order suspending attorney Kent C. Cobb from the practice of law for a period of three months. The order of suspension stemmed from Cobb's representation of a Wyoming resident in a debt collection matter. In the course of the representation, Cobb violated his duty of competence and diligence in addition to failing to communicate with his client. Cobb also made numerous unintentional misrepresentations to his client. Cobb agreed to the suspension, which was recommended to the Supreme Court by the Board of Professional Responsibility of the Wyoming State Bar. Cobb was ordered to pay an administrative fee in the amount of $750.00 and costs of $50.00 to the Wyoming State Bar.

Recommendation

Based upon the foregoing findings and conclusions, the Review Panel recommends that the Court issue an order of three-month suspension of Respondent; and that Respondent be required to pay an administrative fee of $750.00 as provided in Rule 25(b), W.R.Disc.P.

29

Dated this 25 day of February, 2026.

_____
John C. Brooks, Review Panel Chair
Board of Professional Responsibility
Wyoming State Bar

30